UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |
|---|---|
| ORALEE BRANCH, Ph.D., | Civil Action No.:  1:16 cv 3692 |
| Plaintiff, | **COMPLAINT** |
| -against- | |
| NEW YORK UNIVERSITY, NEW YORK UNIVERSITY SCHOOL OF MEDICINE, NEW YORK UNIVERSITY MEDICAL CENTER, NEW YORK UNIVERSITY LANGONE MEDICAL CENTER, DAVID W. MCLAUGHLIN, Ph.D., STEVEN B. ABRAMSON, M.D. & CLAUDIO BASILICO, M.D., | **JURY TRIAL REQUESTED** |
| Defendants. | |

Plaintiff OraLee Branch, Ph.D., by and through her attorneys Carabba Law Firm P.C., as and for her Complaint against New York University, New York University School of Medicine, New York University Langone Medical Center, New York University Medical Center, David W. McLaughlin, Ph.D., Steven B. Abramson, M.D. and Claudio Basilico, M.D. (collectively, "NYU" or "Defendants") alleges upon knowledge of her own acts and upon information and belief as to all other matters, as follows:

**NATURE OF CLAIM**

1.      Plaintiff brings lawsuit against her former employers New York University and its School of Medicine (New York University Langone Medical Center) as well as three of her former superiors, Steven B. Abramson, M.D. (Vice Dean for Education, Faculty and Academic Affairs), Claudio Basilico, M.D. (Departmental Chair) and David W. McLaughlin (Provost) under Federal, State and Local law, as well as the common law of the State of New York, seeking redress for, among other things, gender discrimination, retaliation and breach of contract.

2.      NYU recruited Plaintiff to join its faculty because she was a leading malaria immunology and human infection scientist, who would bring to NYU economic benefits in terms of grant funding from the National Institutes of Health, intellectual property and opportunity based on her scientific samples, publicity based on her research, and other assets surrounding student enrollment and academic training programs.  Before joining NYU, her research, centered on over 2,500 individuals infected with malaria in Peru, South America, had showed enormous promise.  In the short term, Plaintiff and her team were saving lives by finding infections, treating them and learning how to stop reoccurrences.  In the long term, Plaintiff's life's work was contributing to ground-breaking vaccine and drug development, advances in healthcare for pregnant women and infants, and insights in mosquito-spread malaria and other diseases.

3.      Plaintiff's decision to join NYU ultimately destroyed her career.  She was discriminated and retaliated against by a group of dominating males, including her Departmental Chair, who told her that "women are not strong enough to be in science" and that her Department resembled an "inbred colony of women."  Plaintiff's complaints of discrimination caused her to be retaliated against in an ever-escalating fashion.  Defendants refused to properly investigate and remediate her internal claims; refused to follow the clear terms of the tenure appointment and review process; refused to provide the requisite feedback; and ultimately fired her for demonstrably false and pretextual reasons prior to the end of the tenure review period, due to her gender and in violation of NYU policy.

4.      Gender discrimination was not unique to Plaintiff.  Statistics show at NYU, females are paid less, relegated to lesser roles, terminated/not retained more frequently, and are not provided the same opportunities for advancement as comparable males.

5.      In addition, NYU breached Plaintiff's employment contract, which incorporates various NYU policies and procedures governing, among other things, the tenure review process.

Further, NYU failed to take simple -- and required -- steps to protect her scientific samples (vials containing blood, DNA and other biomedical samples stored in freezers) from thawing.  When her laboratory and freezers lost power in Hurricane Sandy, the back up generator failed to operate.  Her samples thawed and were rendered essentially useless.  Her life's work was destroyed.

## **THE PARTIES**

6.      Plaintiff resides in Vancouver, Washington and is a citizen of the United States.

7.      Defendant New York University is a private university comprised of numerous schools and colleges, including the School of Medicine.  Its principal place of business is located at 70 Washington Square South, New York, New York 10012.  According to its website, it is the largest private university in the United States.

8.      Defendant New York University School of Medicine, part of the New York University Medical Center (also known as the New York University Langone Medical Center), a division of New York University, has its principal place of business located at 530 First Avenue, New York, New York 10016.

9.      According to its website, NYU is one of the largest employers in New York City, with over 19,000 employees.  The School of Medicine alone employs over 3,000 faculty.

10.     Defendant Abramson is employed at the School of Medicine as its Chair of the Department of Medicine and Vice Dean for Education, Faculty and Academic Affairs.

11.     Upon information and belief Defendant Abramson is resident of New York State and is a citizen of the United States.

12.     Defendant Basilico is employed at the School of Medicine as a Professor of Molecular Pathogenesis.

13.     Upon information and belief Defendant Basilico is a resident of New York State and is a citizen of the United States

14.     Defendant McLaughlin is employed at NYU as its Provost, ultimately responsible for overseeing and deciding NYU and NYU School of Medicine faculty matters.

15.     Upon information and belief Defendant McLaughlin is resident of New York State and is a citizen of the United States.

16.     Defendants, collectively and individually, are "employers" within the meaning of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e-(b); the New York State Human Rights Law (the "Human Rights Law"), § 292(5); and the New York City Administrative Code (the "City Law"), § 8-102(5).

## JURISDICTION AND VENUE

17.     This court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5 and 28 U.S.C. §§ 1331, 1343.  This court may assert supplemental jurisdiction over the Human Rights Law, City Law and common law claims as authorized by 28 U.S.C. § 1367 (a).  This court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

18.     Venue properly lies within this judicial district as NYU is located within this judicial district and because the unlawful employment practices alleged herein occurred in this judicial district.

19.     Plaintiff has fulfilled the administrative prerequisites prior to filing suit.

20.     Contemporaneously with the filing of this suit, Plaintiff served a copy of the Complaint upon the New York City Commission on Human Rights and the Corporation Counsel for the City of New York.

## THE EEOC FOUND PROBABLE CAUSE FOR DISCRIMINATION

21.     As required for certain of Plaintiff's claims, she initially filed an Administrative Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").  After months of investigation, the EEOC issued its written Determination, finding "reasonable cause to believe that [NYU] has discriminated against [Plaintiff] on the basis of her gender in violation of Title VII…."

22.     The EEOC concluded that NYU's asserted defense "does not withstand scrutiny." For example, NYU asserted that Plaintiff failed to complain about discrimination until months after receiving her termination notice.  According to the EEOC, this was belied by a Faculty Grievance Committee Report, obtained from NYU, substantiating Plaintiff's "allegations that she made numerous complaints of discrimination to her supervisors, mentors, and Human Resources prior to her receipt of the termination letter."  As set forth in the Determination, the Report "reinforces" NYU's failure to act on Plaintiff's complaints in violation of its own policies.  The EEOC also found that Plaintiff's "supervisors and Human Resources actively discouraged" her from making complaints about discrimination.

23.     The EEOC's investigation further revealed that Plaintiff was not the only female targeted.  It found that "at least two additional female faculty members have received notices of their termination" after Plaintiff was fired.

## STATEMENT OF FACTS

24.     Plaintiff is a leading scientific researcher in the field of parasitology and international field studies.  Her career has focused on cutting edge, scientific research into the immune responses to, and pathology of, malaria infections.  She received numerous awards and commendations for her work, including being named the Young Investigator of the Year and a

Sparkman International Scholar and being awarded a Howard Hughes Medical Institute research teaching award.

25.     Plaintiff authored approximately 30 internationally recognized scientific manuscripts propelling the science of malaria and infectious and inflammatory disease.  A television documentary highlighting her research was made.  Plaintiff's work has been acclaimed by experts both within and outside of NYU as innovative, productive and high-impact as it relates to science and public health.

26.     Plaintiff received her Ph.D. in Population Biology, Ecology and Evolution from Emory University in 2001.  She was awarded a post-graduate fellowship at the National Institutes of Health ("NIH").  She was offered a promotion to staff scientist upon completion of her fellowship.

27.     In 2003, the University of Alabama at Birmingham ("UAB") hired Plaintiff as an Assistant Professor in its Department of Medicine.  There, Plaintiff was internationally recognized for establishing a research laboratory and training infrastructure in Peru and India. She used this infrastructure and the resulting biologic samples collected as the foundation to win multimillion dollar grants from NIH and other major grant funding organizations.  In 2008, she was promoted to Associate Professor at UAB.

*NYU recruits Plaintiff; she signs employment contract*

28.     In 2008, while at UAB, NYU recruited Plaintiff to join the faculty of the School of Medicine.

29.     NYU recruited Plaintiff for numerous reasons: she would bring NYU tremendous economic benefit in terms of her grant funding from NIH, as well as intellectual property,

students and academic training programs.  In short, she was sought after because her body of work gave NYU philanthropic, research, funding and academic student enrollment assets.

30.     As a result of NYU's recruitment efforts and promises of various terms and conditions of employment, including those contained in her offer letter/contract of employment, and in reliance thereupon, Plaintiff agreed to join NYU and agreed to continue her employment once there.  She was hired as a tenure-track, Assistant Professor in the Department of Medical Parasitology effective September 1, 2008.

31.     The terms and conditions of Plaintiff's employment were governed by a contract of employment dated August 4, 2008 and signed by Plaintiff, Dr. Karen Day (then Department Chair) and Dr. Robert I. Grossman, Dean of the School of Medicine and its Chief Executive Officer (the "Contract").

32.     Pursuant to the Contract, Plaintiff was required to transfer to NYU her multi-million dollar NIH grant, obtained while at UAB, as well as tens of thousands of critical research samples she had collected using her own scholarship funds and under her various research grants, many from her Peru cohort research project.

33.     The Contract provided an express "understanding" that Plaintiff's grants transferred to NYU would fund 50% of her salary for the first three years of her employment and 60% of her salary thereafter.

34.     The Contract also provided that Plaintiff's academic appointment, tenure eligibility and tenure status would be governed by NYU's Faculty Handbook and the School of Medicine's policies.  The Contract mandated other obligations upon NYU, including providing appropriate laboratory space for her research.

*Plaintiff's performance is stellar; the feedback exceptional*

35.     When Plaintiff joined the School of Medicine, the work environment was both professional and productive.  At that time, her Department Chair was Dr. Karen Day, a leading scientist in her own right.  Dr. Day provided Plaintiff with enormously positive feedback and Plaintiff was confident that her career trajectory would lead to even greater success.

36.     Specifically, when Dr. Day served as Chair, Plaintiff received outstanding evaluations and merit increases.  For instance, in an undated letter to Plaintiff, Dr. Day wrote:

> The expertise you bring and your global health partnership in Peru make us a world class Department and Institution.… One of the many contributions to the Department includes your role in Education Administration, which is greatly appreciated. Your innovative new Medical Scientist Training Program for Medical Students in Global Health is an exciting asset to our Department teaching program…. We appreciate all of your efforts in making the Department and Institution world-class.

37.     Dr. Day concluded that Plaintiff had exceeded the performance expectations and standards in her first year of employment at NYU and, therefore, awarded Plaintiff a merit increase.

38.     As of January 2013, Plaintiff received two additional merit increases, further demonstrating that her performance was exceeding expectations and standards at NYU.

*Defendant Basilico is appointed Chair; the work environment changes drastically*

39.     Plaintiff's work environment changed drastically, however, in late 2010 when Defendant Abramson removed Dr. Karen Day as Chair and replaced her with Defendant Basilico.  At that time, Plaintiff's former Department of Parasitology was merged into a new Department of Microbiology.  As a result of the merger, Defendant Basilico became Chair of the

combined departments, reporting to Defendant Abramson.   Dr. Dan Eichinger, Plaintiff's Division Chair, became her immediate supervisor.

  40. Plaintiff began to suffer from gender discrimination not long after Defendant Basilico became Chair and it continued, unabated, throughout her employment.  The following is just a sample of the pattern of discriminatory conduct:

  a. In October and December, 2011, Plaintiff approached Defendant Basilico with a workplace issue involving credit she was due on a co-written grant.  He refused to intervene on her behalf because did not want to come between "cat fighting women."  This was startling to Plaintiff, first because he used openly derogatory words about women and second because it was the Chair's responsibility to handle such issues, but he was refusing because women were involved.

  b. On December 28, 2011, Defendant Basilico met Plaintiff in his office.  He said, "women do not belong in science."  He took a long drag of his cigarette and blew the smoke directly into her face.  With aggressive tone and body language, he told her she was just a "girl" who was "naïve and delusional" if she thought she could succeed in science.

  c. Upon information and belief, Defendant Basilico made his "women do not belong in science" comment to other women in Plaintiff's department, including Dr. Day.

  d. In January, 2012, Defendant Basilico called Plaintiff to his office.  He said she had good committee review comments and letters of commendation because reviewers "just do not say negative things to women."  For this reason, he refused to accept any recommendation letter given in her tenure review process.

  e. In February, 2012, Plaintiff asked Defendant Basilico for his support for a special grant opportunity.  He again told Plaintiff she was "naïve" and a "little girl."  He said she was "delusional" for being positive and that she and Dr. Day had a "psychological problem for being pushy."  Plaintiff asked for specifics about her performance as well as his support for her career efforts.  He refused.  Plaintiff told him that his biased comments (like "women don't belong in science") were interfering with his judgment and making her uncomfortable.

  f. In May, 2012, Plaintiff gave Defendant Basilico a letter from her doctor requesting time off due to a significant illness.  Plaintiff asked him to review the letter in connection with her request for an accommodation as provided in the Faculty Handbook.  He grabbed the letter and threw it back in her face – while saying, "you don't look like you're dying."  He said she was not strong enough for this work and that she proved his belief that women are not made to be in science.

g.  In December, 2012, while Plaintiff was speaking with Dr. Martin Blaser (Chair, Department of Medicine), Defendant Basilico entered the room and announced that Dr. Day sent too many emails.  He turned to Plaintiff and said, "OraLee, the only emails you are allowed to write are love letters to your husband."  Plaintiff was belittled and embarrassed, especially because he interrupted her grant collaboration conversation with a respected Department Chair and because he was again sabotaging her efforts.

h.  In January, 2013, Defendant Basilico gave Plaintiff a negative performance review and mailed the review to her and others.  Various assertions in the review were false, including that Plaintiff did not write any grants in year-2012.  When Plaintiff objected, his response was "specifics are not important" and she should be more fearful and worried.  Plaintiff pleaded for a clear and transparent review of her performance.  His response was that certain behaviors are "women's behaviors."

i.  Plaintiff asked Defendant Basilico to see her reviews from the extramural evaluation report of the Department of Parasitology (an extramural review committee was asked to give opinions and critiques in August, 2011).  He refused, claiming "the women" of the Parasitology Department would be upset with negative criticism.

j.  Plaintiff was a key investigator for an NIH grant, with Dr. Day as Principal Investigator.  As Dr. Day was leaving NYU, she requested her post-doctoral student (female) to continue to work under Plaintiff for the final few experiments needed to finish the grant.  Defendant Basilico refused to give consent for anyone to work in Plaintiff's laboratory.  This was designed to sabotage Plaintiff and the grant and to embarrass her.  It also caused the female post-doctoral student to be dismissed.

k.  Plaintiff wanted to write a group, multi-professor NIH grant designed to assist in Hurricane Sandy recovery.  She asked those leading the grant effort whether, if she wrote and won the grant, she could take it if she left NYU.  The faculty member in charge of the grant initiative emailed Defendant Basilico that Plaintiff could participate and would be permitted to take the grant.  Defendant Basilico refused to provide Plaintiff with this information.  Then, in or about July, 2013, he called Plaintiff to his office and showed her the approval email.  He began laughing and said, "it is too late, the [grant] deadline has passed."

l.  In 2013, Dr. Basilico moved Plaintiff from her existing office to a small, abandoned office with some nearby laboratory space.  The office was not suitable for Plaintiff and caused her to have health issues, so she asked to be moved.  She was told she could move her belongings into the laboratory.  She carved out an area within the laboratory for her desk/computer/printer and put up signs reading, "Dr. Branch."  Thereafter, Dr. Basilico directed movers to stack boxes and other items in the area marked as Plaintiff's office (even though storage space was available elsewhere).  Plaintiff was literally "boxed in" to her desk area.

m.      Plaintiff wrote a NIH grant to be submitted in or about July, 2013.  She provided it first to Defendant Basilico for review/signature.  Despite providing the grant to Defendant Basilico and his coordinator, Dr. Basilico refused to sign and submit it by the submission deadline.

n.      In or about February, 2013, Plaintiff and Defendant Basilico met in an elevator, during normal working hours.  He said, in a loud and sarcastic tone, "what are you still doing here?"  It was if he was surprised that all his efforts to force her out had failed.

o.      In or about May, 2013, while Plaintiff and Defendant Basilico discussed a grant, he said, in a threating manner, "Abramson said I have control here.  I can do with you what I want."

***Plaintiff complains about discrimination; suffers further discrimination and retaliation***

41.     On or about February 2, 2012, Plaintiff met with her direct supervisor, Dr. Dan Eichinger to complain about Defendant Basilico's harassment, specifically mentioning his statement about women not belonging in science.  She described how in his office he would yell and get close to her face, while brazenly smoking a cigarette (which was shocking given that his office is not only in a smoke free workplace, but also inside a hospital laboratory).  She told Dr. Eichinger she was distressed and upset.  He seemed to understand, responding that other female professors refused to even enter Defendant Basilico's office.

42.     On or about April 20, 2012, Plaintiff met with Dean Abramson to again complain about Defendant Basilico.  Plaintiff objected to Defendant Basilico as being a biased judge of her work performance.

43.     On or about April 25, 2012, Plaintiff asked Dr. Eichinger and two senior female faculty members for advice given the hostile work environment she was suffering.  The response was in effect an acknowledgement that gender discrimination exists at the School of Medicine and that others observed Dr. Basilico's gender-based conduct.  The senior female faculty members reported seeing similar gender-based conduct involving Defendant Basilico and

Defendant Abramson.  They warned her that reporting discrimination would hurt her career.

44.     On or about May 18, 2012, Plaintiff contacted Dr. Eichinger to again describe the gender discrimination and to ask for his advice and help.  On or about May 21, 2012, Dr. Eichinger told Plaintiff not to expect Defendant Basilico's behavior to change much and asked her to consider looking for employment elsewhere because a battle with Dr. Basilico/NYU would adversely affect her chances for tenure.

45.     Plaintiff also complained to her mentoring committee about gender discrimination in or about July, 2012.  The mentoring committee responded that her best option would be to look for another position because she could not change the Department of Microbiology's environment.

46.      Plaintiff also complained about discrimination to Defendant Abramson, in or about February, 2013.  Plaintiff described the gender bias she was suffering, beginning with her first interactions with Defendant Basilico.  Plaintiff requested that Defendant Basilico not be permitted to influence her tenure review.

47.     Defendant Abramson did nothing to remediate the hostile work environment.  He said he wanted to "wait and see" what Defendant Basilico would do, leaving the issue open. This inaction enabled Defendant Basilico to continue to sabotage Plaintiff's career.

48.     In May, July, September and October 2013, receiving no adequate responses to her complaints, Plaintiff complained to NYU's Department of Human Resources, Office of Equal Employment Opportunity.

***Plaintiff is denied a tenure clock extension***

49.     In recognition of Hurricane Sandy's devastating effect on faculty members' research, in or about January, 2013, NYU told Assistant Professors to work with their Chair to

apply for a one to three year extension to their tenure clock.  The Hurricane Sandy Tenure Track Extension was to be reviewed by the mentoring committee, the Chair and the Departmental Appointments and Promotion Committee ("DAPC").   Together they would send their recommendations to Defendant Abramson.

50.    On or about February 25, 2013, Plaintiff was recommended to receive a two year tenure clock extension.  Two years was recommended, rather than three, because Plaintiff still had two years remaining on her tenure clock before Hurricane Sandy hit.

51.    Plaintiff never received a determination from Defendant Abramson's office in response to her extension request.

52.    Upon information and belief, on or about June 11, 2013, Defendant Basilico convened the DAPC, falsely advised it that Plaintiff's extension request had been denied and, therefore, the decision on her tenure had to be made by the end of the 2013-2014 academic year. The EEOC found that Defendant Basilico unilaterally denied Plaintiff's tenure extension request, not the DAPC as required, and that as a result the DAPC voted to terminate Plaintiff's employment.

53.    The minutes of this meeting reflect numerous false, misleading, and/or incomplete representations, by Defendant Basilico and others, concerning Plaintiff's research activities.

***Plaintiff is fired, complains about the termination***

54.    Plaintiff was fired by letter dated June 20, 2013 (the "Termination Letter").  The Termination Letter indicates she was terminated for not procuring sufficient grant funding.

55.    In September, 2013, Plaintiff met with Defendant Abramson to request a grievance committee meeting to present her discrimination issues.  She explained her gender discrimination complaints were not just against Defendant Basilico, but against him as well.

56.     In September, 2013, Plaintiff requested a mentoring committee meeting to discuss the Termination Letter, especially since she received the letter without having received a response from Defendant Abramson or NYU Human Resources.

57.     The meeting was held on or about September 4, 2013.  Plaintiff again complained about gender discrimination and harm it caused her.  In response, Dr. Elizabeth Nardin said, in sum or substance, that these issues were not unique to Plaintiff and that Defendant Basilico was just like her father-in-law.  She told Plaintiff not to raise gender issues.  As Dr. Nardin spoke, her eyes turned red and welled up with tears.  Notwithstanding this acknowledgment, nothing was done in terms of the status of Plaintiff's employment.

### Plaintiff files a faculty grievance

58.     On or about September 20, 2013, Plaintiff requested a faculty grievance hearing as permitted by the Faculty Handbook and as part of Plaintiff's Contract.  Under the Handbook and governing Bylaws, a faculty member can appeal a termination decision first to the School of Medicine's Faculty Grievance Committee ("FGC") and then, if necessary, to the Provost.

59.     As described in the Faculty Handbook, the FGC is charged with hearing grievances related to procedural issues (including timeliness and fairness of evaluations and reviews) as well as those related to work environment (including discrimination and non-effective management).

60.     At her initial session with the FGC, Plaintiff was told that Defendant Abramson instructed the FCG not to consider gender discrimination issues.  Shocked at this limitation, Plaintiff objected because Defendants Basilico and Abramson were deviating from well-established, standard procedures in the Faculty Handbook because of her gender.  Plaintiff produced various exhibits, including proof of her complaints of discrimination and proof of her

grant submissions.

61.     Upon information and belief, on or about December, 2013, the FGC issued its findings (the Faculty Grievance Report) to Dean Abramson.  On or about January 28, 2014, Plaintiff requested a copy of the Report, but was denied.  Based in part on the EEOC's findings, and upon information and belief, the Report supports Plaintiff's claims of discrimination.

62.     In or about February, 2014, Defendant Abramson informed Plaintiff by letter that the FGC considered certain procedural issues related to her tenure review process and concluded the procedures were followed correctly.  Later, he said his letter did not constitute his determination as Dean, so her time to appeal had not started.

63.     On or about August 4, 2014, less than 30 days prior to her NYU end date, Defendant Abramson affirmed Plaintiff's termination.  He acknowledged Plaintiff's right to appeal to a Provost-level Faculty Grievance Hearing.

64.     On or about August 11, 2014, Plaintiff wrote to Provost McLaughlin, describing Defendants Abramson's and Basilico's refusal to follow established procedures and the gender biased work environment.  Plaintiff requested to meet with the Provost's grievance committee.

65.     On or about December 10, 2014, Plaintiff received a letter from Provost McLaughlin denying her request to present a grievance as outlined in the Faculty Handbook. Thus, without even meeting with Plaintiff, the Provost decided to summarily ignore the statutory authority and internal policy and refuse to progress upon the grievance.

***NYU ignored its own established evaluation and tenure track review requirements***

66.     The School of Medicine's written policies and procedures require each tenure track faculty member to have a mentoring committee made up of senior faculty members to provide them with on-going feedback and performance assessments, as well as their progress

towards tenure throughout the tenure period (the "tenure clock").  The mentoring committee is required to meet the faculty member at least yearly and issue annual written reports for the member and her Chair.

67.     In addition, the Departmental Chairs are required to evaluate faculty annually and advise them "of their prospects of being recommended by the Department for promotion or … tenure."   The annual evaluations, due each September, must review the faculty member's performance in the preceding academic year and provide the performance expectations for the upcoming year.

68.     Tenure track faculty must also receive an additional "mandatory, formal review" during the third and sixth years of employment.  This review is performed first by the DAPC and then the Department Chair.  During these reviews the Department Chair is required to meet the faculty member and review her prospects for tenure, so that "if the likelihood of being recommended for tenure at the time of the sixth-year review is considered poor" the Chair and faculty member can discuss the options available during the remaining three years of the probationary period.

69.     Plaintiff was hired as an Assistant Professor and, therefore, should have received progress reviews over seven years, with a tenure decision due between the seventh and tenth year of employment.  These and other tenure review requirements and procedures are set forth in the Faculty Handbook.

70.     As to Plaintiff, and with knowledge and participation of Dean Abramson, the requirements were not followed.  For example:

    a.     Plaintiff's mentoring committee failed to meet with her on an annual basis and did not issue its first report until December 20, 2011 (Plaintiff's fourth year of employment).   Defendant Basilico refused to approve the composition of Plaintiff's committee until October, 2011.

b.      Plaintiff did not receive an annual evaluation from Defendant Basilico for the 2010 academic year (Plaintiff's third year of employment).

c.      Plaintiff's "mandatory third year review" did not begin until the middle of her fourth year.   Worse yet, Defendant Basilico refused to complete the review correctly – he completed all sections of the review rather than permitting DAPC to complete its portion as required.

d.      Defendant Basilico refused to perform Plaintiff's annual performance evaluation for the 2011 academic year.  Instead, she was given her 2011 evaluation in June, 2012.   The evaluation falsely stated her failure to meet extramural funding expectations.

***The reason for termination, lack of funding, is pretextual***

71.      Defendants' purported ground for firing Plaintiff, that she was unable to support 60% of her salary with external funding for a single (2011-2012) academic year, is both false and pretextual.

72.      An analysis of the publically available funding data contained in NIH's Research Portfolio Online Reporting Tools, reveals that from 2006 to 2013, it appears that at least three, non-tenured male faculty associated with the Department of Microbiology had a year or more without NIH funding.  Upon information and belief, none of those male faculty members were fired in response.

73.      The discrimination and retaliation engaged in by Defendants has caused, and will continue to cause, Plaintiff significant emotional trauma and distress, as well as a continued course of medical attention and treatment.

***Gender discrimination is systemic at NYU***

74.      Gender based discrimination was not directed against Plaintiff alone.  There are numerous examples of female faculty members being treated negatively as compared to similarly situated males.

75.    For instance, as mentioned above, all tenure track Assistant Professors at the School of Medicine impacted by Hurricane Sandy were advised of their right to request a tenure clock extension.  As to Plaintiff's department, males who applied were granted the extension. Defendant Basilico discouraged one female from applying.  Plaintiff, the other female, did not receive the extension.

76.    Prior to Defendant Basilico becoming Chair of the combined Microbiology and Parasitology department, the parasitology department had 14 faculty, 10 female and four male, while the microbiology department, long chaired by Defendant Basilico, was over 75% male.  In or about 2011, the combined department's primary and secondary faculty consisted of approximately 24 faculty members, with only eight females.  By the time Plaintiff was fired, only three females had senior professor rank (13%).  By contrast, approximately 75% of the male faculty members had senior professor rank.

77.    Gender inequality is a recognized problem at NYU.  Just prior to Plaintiff arriving at NYU, a senior faculty member was appointed by then-Dean of Medicine, Robert Glickman to investigate the issue of gender inequality.  Upon information and belief, at the conclusion of her investigation, she issued a report confirming the existence of systemic discrimination, including finding that women were likely to be put into non-scientific committees, rather than more prestigious scientific roles.  This would cause women to be unable to advance in their science careers, since they would be unable to gain scientific independence and equity with the senior male investigator researchers.  This also meant that the women would not be present (invited) to "sit at the table" with the male leadership.

78.    Upon information and belief, at or around the time of this report, Dean Abramson was involved in a matter with gender discrimination allegations and, based on those allegations, he was removed from his position and demoted.  However, upon Dean Glickman stepping down,

Robert Grossman was appointed Dean.  Dean Grossman reinstated Dean Abramson to a senior leadership role.

79.     Upon Dean Abramson resuming his leadership position, females in senior leadership roles were targeted -- pushed out or fired.  On information and belief, of 16 women in Chairperson or Senior Dean or Center Chief roles, only four remained by late 2013.  In stark contrast, there was a much lower ratio of men who left.  Upon information and belief, of 43 males, 31 remained by late 2013.

80.     In a Faculty Senate Meeting held on or about January 13, 2014, the issue of tenure statistics in relation to gender was raised.  Upon information and belief, based on information presented at the meeting, the "recent" data shows 83% of those receiving tenure are male.  As set forth in the meeting minutes, a female professor noted the dearth of women up for tenure and exclaimed, if you are a woman in some departments "god help you" getting tenure because of the male domination.

81.     Additional statistics, taken from NYU's website at the time of the EEOC's investigation, are startling.  Upon information and belief, of the total number of Department Chairs at the School of Medicine, 28 are male (85%).  Of 30 Deans, 20 are male (67%).  These statistics evidence an environment overwhelmingly favoring males.

***NYU failed to maintain its facilities as required***

82.     Upon joining NYU, Plaintiff effectuated the transfer of her biological research samples obtained from approximately five years of following over 2,500 human subjects in Peru.  These samples formed a frozen (cryopreserved) biorepository.  Scientific studies on the samples formed the foundation of her career.

83.     Plaintiff's Contract required NYU to provide her "with laboratory space appropriate to [her] needs and activities."  Her laboratory was in NYU's Old Public Health Building ("OPH"), 341 East 25th Street, New York, New York.  OPH had large freezers on the fourth and sixth floors for the storage and safekeeping of laboratory samples, including Plaintiff's samples (some transferred from UAB and some collected during her NYU employment).

84.     Plaintiff's blood samples, sera samples and other bodily fluid samples were required to be stored at -80$^o$C.  Plaintiff's "DNA samples" were required to be stored at -20$^o$C.  If biological samples reach temperatures greater than 0$^o$C for any material length of time, the biological substances in the samples are ruined and sample-based experiments or research is rendered impossible or, at best, flawed.  Without electricity, freezers, including those in OPH, can reach room temperature in approximately twelve hours.

85.     Given the critical importance of maintaining proper temperatures, various statutory and regulatory mandates require facilities conducting health research to have generator backup for electricity and to maintain/test the generators on a monthly basis.  *See, e.g.*, NIH's National Institute of Allergy and Infectious Diseases, Guidelines for Good Clinical Laboratory Practice Standards.

86.     In addition, and upon information and belief, NYU must certify, in connection with its receipt of NIH grant funds, that its laboratories and facilities are in compliance with, among other things, the Code of Federal Regulations  as well the terms of the grant itself.  *See* NIH Grants Policy Statement, Notice of Grant Award, and Clinical Terms of Award.

87.     Defendant Basilico had no interest in properly maintaining (or overseeing the maintenance of) Plaintiff's laboratory and OPH, a building he derisively called "over-run by women."  His office and laboratory were not in OPH.

88.    On October 29, 2012, Hurricane Sandy made landfall in New York City.   At approximately 8 p.m., OPH lost electrical power.   OPH's backup generator, which upon information and belief had not been properly inspected, maintained or tested, did not become operational upon the power failure.   The generator is on the roof, so flooding was not the cause of its non-operation.

89.    In the early morning of October 30, 2012, NYU told Plaintiff the generator failed. The facilities staff asked her come to OPH with basic tools and emergency equipment to help deal with the crisis.   Although Plaintiff was dealing with the effects of the storm at her home, she agreed.   She searched multiple hardware stores, found a power generator and tools, and rushed to OPH.

90.    Once on the roof, she found the non-functioning generator and it had a rusted solenoid.   Unfortunately, her purchased generator was incompatible with the electrical load of the OPH systems, but the building superintendent was able to use car battery jumper cables (purchased by Plaintiff) to jump-start the generator.   This "fix" worked only for a moment, because the generator's fuel supply line had rusted (another maintenance failure by NYU) making it impossible for fuel to power the generator.

91.    Plaintiff worked frantically on the roof and the building's stairwells to retrofit her purchased generator to OPH's electrical requirements.   Eventually, NYU contractors arrived to help.

92.    Plaintiff navigated the dark corridors to reach the freezers containing her samples. As she opened a freezer door, she saw liquid dripping and accumulating at the bottom of the freezer.   Her samples had thawed.   She was devastated.

93.    Although NYU officials had informed faculty and staff in the days preceding Hurricane Sandy that they would order appropriate quantities of dry ice in anticipation of a

power outage, this was not done.

94.     When Hurricane Sandy hit, OPH had only a small number of liquid nitrogen tanks and only its standard (and limited) order of dry ice, which was not nearly enough.

95.     The destruction of Plaintiff's life's work made it virtually impossible for her to obtain external research grants and continue to research and publish or be involved in the current worldwide health issues concerning vector borne infections, such as mosquito-carried viruses and parasites.   Included within her repository were thousands of biological samples from pregnant women who contracted infections in pregnancy, as evidenced by high levels of inflammatory blood products called cytokines.   Cytokines cannot survive the catastrophic thawing that occurred in OPH.   Thus research to improve public health and save lives from malaria or other mosquito-carried infections (such as Zika virus) was rendered impossible.


**FIRST CAUSE OF ACTION**
**Gender Discrimination**
**(against all Defendants)**

96.     Plaintiff realleges and incorporates by reference paragraphs 1 through 95 of the Complaint as if fully alleged herein.

97.     By the aforementioned actions, Defendants, separately and together, have discriminated against Plaintiff in the terms, conditions, and privileges of her employment, on the basis of gender, in violation of Title VII, the Human Rights Law, including but not limited to N.Y. Exec. L. § 296 (1), (6), (7), and in violation of the City Law, § 8-107.

98.     By reason of the continuous nature of Defendants conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the facts alleged herein.

99.     As a result of the discrimination engaged in by each of the Defendants, Plaintiff has suffered, and will continue to suffer, severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, serious physical illness and humiliation.

## SECOND CAUSE OF ACTION
### Gender Discrimination: Hostile Work Environment
### (against all Defendants)

100.    Plaintiff realleges and incorporates by reference paragraphs 1 through 99 of the Complaint as if fully alleged herein.

101.    By the aforementioned actions, Defendants, separately and together, have subjected Plaintiff to a hostile and abusive work environment on the basis of her gender, in violation of Title VII, the Human Rights Law, including but not limited to N.Y. Exec. Law § 290 *et seq.*, and in violation of the City Law, § 8-107.

102.    The conduct was significant and egregious, not trivial or petty.

103.    By reason of the continuous nature of Defendants' conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the facts alleged herein.

104.    As a result of the harassment engaged in by Defendants, Plaintiff has suffered, and will continue to suffer, severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, serious physical illness and humiliation.

## THIRD CAUSE OF ACTION
### Aiding and Abetting Gender Discrimination
### (against all Defendants)

105.    Plaintiff realleges and incorporates by reference paragraphs 1 through 104 of the Complaint as if fully set forth herein.

106.    By the aforementioned actions, Defendants, separately and together, have aided and abetted discrimination against Plaintiff in the terms, conditions, and privileges of her employment, on the basis of her gender, in violation of the Human Rights Law § 296(6) and City Law § 8-107(6).

107.    By reason of the continuous nature of Defendants conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the facts alleged herein.

108.    As a result of the aiding and abetting engaged in by each of the Defendants, Plaintiff has suffered, and will continue to suffer, severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, serious physical illness, mental anguish and humiliation.

## FOURTH CAUSE OF ACTION
### Retaliation
### (against all Defendants)

109.    Plaintiff realleges and incorporate by reference paragraphs 1 through 108 of the Complaint as if fully set forth herein.

110.    Defendants, separately and together, have discriminated against Plaintiff in retaliation for, and on account of, opposing discrimination and asserting rights under the anti-discrimination laws with respect to compensation, terms, conditions and privileges of employment in violation of Title VII, the Human Rights Law and City Law.

111.    By reason of the continuous nature of Defendants conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the facts alleged herein.

112.    Plaintiff suffered actions that would be reasonably likely to deter individuals from engaging in protected activity.

113.    As a result of each of the Defendants' retaliation against her, Plaintiff has suffered, and will continue to suffer, severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, serious physical illness and humiliation.

## FIFTH CAUSE OF ACTION

### Violation of Title IX
### (against all non-individual Defendants)

114.    Plaintiff realleges and incorporate by reference paragraphs 1 through 113 of the Complaint as if fully set forth herein.

115.    The non-individual Defendants are educational programs, which at all times relevant to this action, received federal funding.

116.    The gender-based discrimination, retaliation and other conduct alleged above, culminating in Plaintiff's termination, was so severe and pervasive that she and other females were denied access to educational opportunities or benefits provided by Defendants.

117.    Defendants lack of policies and procedures, and their failure to properly investigate and/or address Plaintiff's internal complaints, resulted in Plaintiff and students being excluded from participation in, and denied the benefits of, Defendants' education program.

118.    The non-individuals Defendants, separately and together, have discriminated against Plaintiff in retaliation for, and on account of, opposing discrimination and asserting rights

under the anti-discrimination laws with respect to compensation, terms, conditions and privileges of employment in violation of Title IX.

119.    By reason of the continuous nature of Defendants conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the facts alleged herein.

120.    The non-individual Defendants have failed to prevent, respond, adequately investigate and/or appropriately resolve instances of gender discrimination, retaliation and hostile work environment.

121.    As a result of each of the non-individual Defendants' conduct against her, Plaintiff has suffered, and will continue to suffer, severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, serious physical illness and humiliation.

**SIXTH CAUSE OF ACTION**
**Breach of Contract**
**(against all non-individual Defendants)**

122.    Plaintiff realleges and incorporates by reference paragraphs 1 through 121 of the Complaint as if fully alleged herein.

123.    The non-individual Defendants breached Plaintiff's Contract, including but not limited to the Faculty Handbook and other applicable policies and procedures incorporated by reference therein, including but not limited to in the following respects:

a)   shortened Plaintiff's tenure probationary period and failed to notify her that it had done so or adjust the timing of her third and sixth year reviews accordingly;

b)   failed to comply with the terms of Plaintiff's Contract and the applicable policies in evaluating her performance with respect to the amount of external funding she had obtained;

c)   failed to provide Plaintiff with adequate laboratory space appropriate to her needs; and

    d)  failed to comply with the grievance policy.

124.    As a result of the foregoing, Plaintiff has suffered damages and injury including, but not limited to loss of employment and salary and other benefits and loss or damage to her professional reputation and career.

### SEVENTH CAUSE OF ACTION
**Breach of Third Party Beneficiary Contract**
**(against all non-individual Defendants)**

125.    Plaintiff realleges and incorporates by reference paragraphs 1 through 124 of the Complaint as if fully alleged herein.

126.    Plaintiff is a third party beneficiary under various contracts (Notice of Awards) between NYU and NIH.

127.    In the applicable contracts, Plaintiff is listed as the "Principal Investigator" for the grant meaning, among other things, she was responsible for performing and overseeing the research and scientific direction of the underlying grant award/project.

128.    Plaintiff was the intended beneficiary of the NIH-funded grants at issue, as Plaintiff applied for the grant and the grant was intended to benefit Plaintiff in terms of, among other things, her research and scientific goals and objectives.

129.    As Principal Investigator, Plaintiff reasonably and justifiably relied upon NYU's representations, promises and obligations as set forth in the contracts.

130.    NYU accepted the terms of the contract by accepting NIH's funds.

131.    NYU failed to adhere to the mandates, terms and conditions of the contracts, including those cited therein and incorporated therein by reference.

132.    In breaching the terms of the contracts, NYU has caused, and will continue to cause, significant harm and damages.

## EIGHTH CAUSE OF ACTION
**Breach of Bailment Contract**
**(against all non-individual Defendants)**

133.    Plaintiff realleges and incorporates by reference paragraphs 1 through 132 of the Complaint as if fully alleged herein.

134.    Plaintiff provided thousands of biologic/scientific samples to NYU pursuant to her Contract and various NIH and other grants where she was listed as Principal Investigator.

135.    Plaintiff provided such samples to NYU for her benefit and the benefit of NYU.

136.    Plaintiff entrusted her samples to NYU.

137.    NYU took lawful possession of the samples and was required to safeguard them and hold them in trust for the purposes of meeting the requirements of the awarded grants.

138.    Given the circumstances, a bailment arose with respect to the subject samples, with Plaintiff as bailee and NYU as bailor.

139.    Defendants breached the duty of care required by the bailment by, among other things, failing to adhere to the mandates, terms and conditions of the contracts, including those cited therein and incorporated therein by reference and failing to properly care for the samples.

140.    In breaching the terms of the contracts, and NYU has caused, and will continue to cause, significant harm and damages.

**WHEREFORE**, Plaintiff demands that judgment be entered in her favor and that the Court order and award Plaintiff the following relief against Defendants:

A.    Damages in the form of (i) back pay with interest based on Plaintiff's appropriate compensation had she not been discriminated against; and (ii) front pay.

B.    Compensatory damages for her emotional pain and suffering, mental anguish, distress, serious physical illness, humiliation, and loss of reputation in an amount to be determined at trial;

C.      Punitive damages in an amount to be determined at trial;

D.      Direct, indirect and consequential damages resulting from Defendants' breach of contract, bailment contract, and/or third party beneficiary contract;

E.      Attorneys' fees;

F.      Costs and disbursements;

G.      Pre and Post Judgment Interest; and

H.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury as to all issues in the above matter.

Dated: New York, New York
      May 17, 2016

Respectfully submitted,

CARABBA LAW FIRM P.C.

s/ Anthony Carabba, Jr.
By:_____
Anthony Carabba, Jr.

85 Worth Street, 3rd Floor
New York, New York 10013
212.430.6400
acarabba@carabbalaw.com

*Attorney for Plaintiff*